## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

SHARON SKLAROV, ATG TRUST COMPANY )
AS SUCCESSOR TRUSTEE TO NORTHERN )
TRUST COMPANY AS TRUSTEE UNDER )
TRUST AGREEMENT DATED FEBRUARY )
15, 2001 AND KNOWN AS TRUST NUMBER )
9810 and VAL SKLAROV, )
A/K/A VLADIMIR SKLAROV, )
 )
     *Plaintiffs,* )
 )
v. ) **CASE NO.**
 )
BMO HARRIS, N.A., AS SUCCESSOR IN ) **JURY TRIAL DEMANDED**
INTEREST TO AMCORE BANK, N.A., )
BANK OF MONTREAL, and FEDERAL )
DEPOSIT INSURANCE CORPORATION )
 )
 )
 )
     *Defendants.* )

## COMPLAINT AT LAW

NOW COMES Plaintiffs, SHARON SKLAROV, ATG TRUST COMPANY AS

SUCCESSOR TRUSTEE TO NORTHERN TRUST COMPANY AS TRUSTEE

UNDER TRUST AGREEMENT DATED FEBRUARY 15, 2001 AND KNOWN AS

TRUST NUMBER and VAL SKLAROV, A/K/A VLADIMIR SKAROV, though their

attorneys, Peoples Advocate Group, P.C., and complains of Defendants, BMO HARRIS,

N.A., AS SUCCESSOR IN INTEREST TO AMCORE BANK, N.A., BANK OF

MONTREAL, and FEDERAL DEPOSIT INSURANCE CORPORATION, as follows:

## NATURE OF THE CASE

1.     This Complaint arises from a complaint for Judgment of Foreclosure and Sale on a certain parcel of real property, commonly referred to as 513-554 York Boulevard, Bensenville, Illinois ("York"); In addition to the principal basis for this matter, the Complaint also is in response to the manipulation, suppression and inflation of the London Interbank Offered Rate ("LIBOR"), a benchmark rate indexed to trillions of dollars in interest-rate swaps and loans that plays fundamentally important role in financial systems throughout the world.

2.     The York property includes a multi-unit commercial industrial facility which is rented out to a number of companies doing business in Bensenville and the surrounding area.

3.     On January 26, 2004, the Defendants entered into a mortgage agreement with Amcore Bank N.A. ("Amcore").  In addition, a First, Second, Third and Fourth Amended Promissory Notes (hereinafter referred as the "Note") was executed by the Defendants on December 1, 2008 where the interest rate would be adjusted monthly based on the LIBOR Rate in place at the time plus four percent (4%).  (Fourth Amended Promissory Note Attached as Exhibit A)

4.     On April 23, 2010 Amcore was placed into receivership with the Federal Deposit Insurance Corporation ("FDIC"), and the Plaintiff BMO purchased the assets, including the subject note and mortgage.

5.     VAL and SHARON SKLAROV ("Sklarovs") held the beneficial interest in the Trust which holds title to the York property.

6.     BMO Harris Bank N.A., ("BMO") claims, by virtue of an assignment

from the FDIC, to hold a mortgage for York.

      7.     The complaint for Judgment of Foreclosure and Sale was filed in July of 2012.

      8.     In June 2013, Plaintiff moved for summary judgment, providing an affidavit as to the amounts due.

      9.     In response, Defendants raised issues with the supporting affidavit and the amounts due, including the accrual of default interest during the forbearance period, indexed against the London-Interbank-Offered-Rate hereinafter ("LIBOR")

      10.    The Court found there was no genuine issue as to the loan documents, default, principal and interest, but the Court sought further explanation of the operation of the forbearance agreement.

      11.    The parties provided supplemental briefing on the issue of whether default interest was a "remedy" under the forbearance agreement and, if so, whether default interest was to accrue during the forbearance period. All the while BMO continued to assess a default (punitive) interest rate indexed against LIBOR.

      12.    The Court found that Forbearance agreement was ambiguous as to the accrual of default interest during the forbearance period.

      13.    On or about May 13, 2014 Sklarovs motion for leave to assert counterclaim based on the fraudulent and manipulated benchmark interest rate LIBOR which was used as the index for the loan and default (punitive) interest was denied.

      14.    Defendants asserted that Plaintiffs had constructive and actual notice as to the manipulation of the LIBOR rate, and continued to index against said fraudulent LIBOR rate.

15.     On May 13, 2014 Sklarovs Motion for Leave to Assert Counterclaim was denied, having been denied ability to assert arguments as to an unlawful interest rate.

16.     Therefore the Court found that summary judgment as to liability was proper.

17.     On or about March 14, 2014, the Federal Depositor Insurance Corporation ("FDIC") filed a multi-count complaint on behalf of Amcore Bank ("Amcore") who was the originator of the subject loan against numerous banks of LIBOR ("London Interbank Offered Rate") manipulation; this complaint is very recent and newly discovered information.

18.     The FDIC specifically claims that the members ("Panel Banks") of the United States Dollar LIBOR Panel ("USD LIBOR") fraudulently and collusively manipulated the USD LIBOR and the Panel Bank Defendants engaged in this fraudulent and collusive conduct from August 2007 through at least mid-2011. (*Id.*)


## JURISDICTION AND VENUE

19.     This action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Section 22 of the Commodities Act, 7 U.S.C. § 25.

20.     This Court has jurisdiction over this action pursuant to Section 22 of the Commodities Act, 7 U.S.C. § 25, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), and 28 U.S.C. §§ 1331 and 1337.

21.     Venue is proper in the Northern District of Illinois, pursuant to Section 22 of the  Commodities Act, 7 U.S.C. § 25(c), and 28 U.S.C. § 1391(b), (c) and (d). Each of the Defendants transacted business in the District and a substantial part of the events or

omissions giving rise to the claims here occurred in this District. Defendants' unlawful conduct manipulated the prices of LIBOR-based derivative products traded in this District.

## PARTIES

22.     Plaintiff Sharon Sklarov is an individual

23.     Plaintiff Val Sklarov is an individual

24.      Defendant BMO Harris Bank, N.A. is a Chicago-based bank, and a subsidiary of Bank of Montreal. BMO Harris participated in the wrongful conduct alleged in this Complaint both directly and indirectly.

25.     Defendant Bank of Montreal is one of the Big Five banks in Canada. It is a member of the Federal Reserve System (FRS) and a registered member of the Federal Deposit Insurance Corporation (FDIC). Bank of Montreal participated in the wrongful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

26.     Defendant Federal Deposit Insurance Corporation (FDIC) is a United States government corporation, which at insures and regulates deposit institutions in the state of Illinois, and was the receiver and assignor of Amcore Bank N.A. to BMO Harris.

27.     At all relevant times, Defendants were acting as the agents, employees, co-conspirators, and/or representatives of their respective "affiliates" and were acting within the course and scope of their agency, employment, and/or conspiracy with the full knowledge, consent, permission, authorization, and ratification, either express or implied, of each of their respective affiliates in performing the acts alleged in this Complaint.

## BACKGROUND

1. This case involves a certain parcel of real property, commonly referred to as 514-554

York Boulevard, Bensenville, Illinois ("York") and legally described as follows:

> LOTS 1 AND 4 IN SCHUTTER'S DIVISION OF LOT 2 IN MOHAWK
> ACRES, A SUBDIVISION IN THE SOUTHEAST ¼ OF SECTION 11,
> TOWNSHIP 40 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL
> MERIDIAN, ACCORDING TO THE PLAT OF SAID SCHUTTER'S
> DIVISION RECORDED JULY 13, 1949 AS DOCUMENT 571632, IN
> DUPAGE COUNTY, ILLINOIS.

2. The York property includes a multi-unit commercial industrial facility

which is rented to a number of companies doing business in Bensenville, Illinois.

3. The Sklarovs hold the beneficial interest in the Trust which holds title to

the York property.

4. BMO claims, by virtue of an assignment from the FDIC, to hold a

mortgage and a Promissory Note for York. Very recently, on or about March 14, 2014,

the Federal Depositor Insurance Corporation ("FDIC") filed a multi-count complaint on

behalf of Amcore Bank ("Amcore") who was the originator of the subject loan against

numerous banks of LIBOR ("London Interbank Offered Rate") manipulation. (*Cover

Page of Case No. 14 CV 1757 attached hereto attached as Exhibit B*).

5. The FDIC specifically claims that the members ("Panel Banks") of the

United States Dollar LIBOR Panel ("USD LIBOR") fraudulently and collusively

manipulated the USD LIBOR and the Panel Banks Defendant engaged in this fraudulent

and collusive conduct from August 2007 through at least mid-2011. (*Id.*)

6. The LIBOR scandal began to unfold around 2007, when the media began

reporting about USD LIBOR rate manipulations by Panel Banks.

7.     Upon information and belief, BMO had actual and/or constructive knowledge of Panel Banks' fraudulent acts in setting the USD LIBOR rates.

8.     Despite BMO's knowledge of the fraudulent manipulation of the USD LIBOR rate, BMO continued perpetuating the fraud by continuing to index the Sklarovs' subject interest rate against USD LIBOR.

9.     Furthermore, BMO failed to disclose to the Sklarovs any potential issues with the USD LIBOR.

10.    BMO continued charging/calculating an interest rate based on the fraudulent LIBOR rate disregarding BMO's loan provisions.

## I.   BMO'S KNOWLEDGE OF LIBOR'S SIGNIFICANCE AND IMPORTANCE

11.    The London Interbank Offered Rate, or LIBOR, is a benchmark for short term interest rates in the global money market. The LIBOR is now indexed to trillions of dollars in interest-rate swaps and loans that plays a fundamentally important role in financial systems throughout the world.

12.    A lot of banks used the USD LIBOR as a benchmark rate for setting interest rates on various types of consumer and corporate loans. Some other financial instruments that are linked to USD LIBOR are: Forward Rate Agreements; Interest Rate Swaps; Credit Default Swaps; Asset Swaps; Inflation Swaps; Total Return Swap; Options; Floating Rate Notes; Syndicated Loan; and Collateralized Debt Obligations.

13.    Banks make use of the LIBOR rate when setting/calculating the interest rate for savings, loans, and mortgages. Generally, most of the loans have a LIBOR interest index provision and like all mortgages the loans have a "default" rate tied to LIBOR. Specifically, the subject interest rate was based on the USD LIBOR. The rates

are thus closely monitored by lending banks who disburse residential or business loans or provide savings schemes that are based on these indexes.

14.     BMO Harris Bank has a long standing in the banking and finance industry. BMO Harris' predecessor, Harris Bank was established as early as 1882. BMO is one of the largest banks in the Midwest.

15.     Being in the banking sector for such loans and by using the USD LIBOR index provisions in its loan arrangements, it is self evident that BMO knew the importance and significance of world's most important number—the USD LIBOR.

## II.     FRADULENT AND COLLUSIVE CONDUCT RELATING TO LIBOR AND SYSTEMATIC LIBOR SUPPRESSION

16.     The USD LIBOR manipulation began to unfold as early as 2007 when Barclays manipulated it LIBOR submissions.

17.     Between 2007 and 2008, many of the Panel Banks' portfolios in were weighted such that the Panel Banks would financially benefit from reductions in floating interest rates.

18.     Around August 16, 2007, all of the Panel Banks made evidently lower USD LIBOR submissions than the previous week's projections, and submissions depicted notable dispersion in early August. However, the LIBOR submissions showed significant uniformity by the month end. This change in pattern supported allegation that the Panel Banks began colluding on the USD LIBOR in August 2007.

19.     In early September 2007, news media began public reporting of the low level of LIBOR fixings. The mainstream media began to aggressively investigate about

the manipulation when a series of Wall Street Journal articles in 2008 exposed the possibility of targeted misquotes.

20.     BMO Harris had actual or constructive knowledge that the USD LIBOR was manipulated when various media began reporting of the manipulated rates. BMO suppressed and in fact contributed to Panel Banks' LIBOR manipulation because it continued to link the USD LIBOR to its financial products, including the Sklarovs' loans, after knowing that LIBOR was manipulated.

## COUNT I: VIOLATIONS OF SHERMAN ANTITRUST ACT

21.     Plaintiffs reallege and hereby incorporate preceding paragraphs as if fully set forth herein.

22.     Upon information and belief, starting August 2007, the Panel Banks and their co-conspirators entered into agreements and conspired to submit false USD LIBOR submissions in restraint of trade to artificially fix or manipulate the USD LIBOR.

23.     The Panel Banks manipulated the price and quality of financial products indexed to the USD LIBOR and basically harmed the competitive process in the U.S. finance market. These acts had a substantial effect on the foreign and interstate trade and commerce of the U.S.

24.     Upon information and belief, BMO had actual or constructive knowledge that the USD LIBOR rates were manipulated.

25.     BMO silently used the manipulated USD LIBOR as a benchmark to fix the interest rate for the loans that it approved. In this case, the subject interest rate was set using the USD LIBOR as a benchmark.

26.     BMO thus manipulated the value and amounts paid on LIBOR-linked financial instruments, thus causing significant financial detriment to the Plaintiff.

27.     As a result of these acts, BMO violated federal antitrust laws, including the Sherman Antitrust Act and Clayton Antitrust Act.

28.     The aforesaid concerted action between the Panel Banks and BMO resulted in: restraint, suppression, and manipulation of the USD LIBOR; denial to the public of a benchmark (USD LIBOR) rate that is fair and free of suppression and manipulation; and loss of global financial integrity, specifically with respect to use of the USD LIBOR as a benchmark for other financial instruments.

29.     The Sklarovs have been injured and will continue to be injured in their business and property by having to pay an interest rate that is based on a manipulated benchmark: the USD LIBOR. The Sklarovs are now forced to pay an interest based on manipulated rates, and they are deprived the benefits of interest rates in a perfectly competitive market in which there is no collusion.

30.     These damages are a direct result of the concerted activity and the USD LIBOR manipulation and the resultant interference with competitive market forces.

31.     According to the provisions of the Clayton Act, the Sklarovs are entitled to recover treble damages they sustained in addition to the interest, and reasonable attorneys' fees, costs and expenses.

32.     The Sklarovs are entitled to monetary relief, as trebled under the statute, as well as an injunction against BMO, preventing and restraining the violations alleged herein. BMO thus was a part of illegal restraint of trade and violated section 1 of the Sherman Act.

## COUNT II: BREACH OF CONTRACT

33.     Plaintiffs reallege and hereby incorporate preceding paragraphs as if fully set forth herein.

34.     Pursuant to the Note interest on the subject property/mortgage was required to accrue on the outstanding principal balance of the note at an annual rate equal to the LIBOR rate plus Four percent (4%).

35.     Specifically, section 8.7 of the Note states:

If any provision of this Note is deemed to be invalid by reason of the operation of law, or by reason of the interpretation placed thereon by any administrative agency or any court, Borrower and Lender shall negotiate an equitable adjustment in the provision of the same in order to effect, to the maximum extent permitted by law, the purpose of this and the validity and enforceability of the remaining provisions, or portions or applications thereof, shall not be affected thereby and shall remain in full force and effect.

36.     Section 8.8 of the Note states:

If the interest provisions herein or in any of the Loan Documents shall result, at any time during the Loan, in an effective rate of interest which, for any month, exceeds the limit of usury or other laws applicable to the loan, all sums in excess of those lawfully collectible as interest of the period in question shall, without further agreement or notice between or by any party hereto, be applied upon principal immediately upon receipt of such monies by Lender, with the same force and effect as though the payer has specifically designated such extra sums to be so applied to principal and Lender had agreed to accept such extra payment(s) as a premium-free prepayment. Notwithstanding the foregoing, however Lender may at any time and from time to time elect by notice in writing to Borrower to reduce or limit the collection to such sums which, when added to the said first-stated interest, shall not result in any payments toward principal in accordance with the requirements of the preceding sentence.  In no event shall any agreed to or actual exaction as consideration for this Loan transcend the limits imposed or provided by the law applicable to this transaction or the makers hereof in the jurisdiction in which the Premises are located for the use or detention of money or for forbearance in seeking its collection."

37.     The subject Notes on this Loan clearly states that if the interest rate violates applicable laws that all interest shall be equitably adjusted or applied to principal. Therefore, pursuant to their own Loan Documents, interest indexed against a LIBOR based interest rate, which has been declared a fraudulent rate by BMO's partner the FDIC (as receiver for Amcore), the current exaction of interest application and principal reduction on the subject loan has not and cannot currently be determined.

38.     Rules require that inputs to the LIBOR be an honest reflection of competitive inter-bank interest rates.

39.     Banks are able to make their money based on the LIBOR by charging a spread above and over the LIBOR. Therefore, a manipulated LIBOR rate can lead to additional interest being falsely obtained by a bank.

40.     Financial instruments that incorporated the USD LIBOR were priced based on the understanding that free market forces, and not collusion, would determine the stream of income generated by those financial instruments.

41.     By submitting and publishing interest rates that were determined by collusion rather than by competition, the Panel Banks interfered with the competitive process in the markets for money and LIBOR-based financial instruments and artificially increased the prices they charged, and margins they earned, in those markets including the markets for interest-rate swaps. Consequently, the LIBOR rate, as a result of these actions, is in violation of existing law.

42.     Furthermore, in the Purchase and assumption agreement executed by BMO as the Assuming Institution for Amcore, the parties represented that the execution,

delivery, and performance of the Agreement did not violate or conflict with any law applicable to it. (*Purchase and Assumption Agreement to be provided Instanter*).

43.     Article XI (i) & (ii) of Purchase and Assumption agreement (available upon request) signed by BMO and Amcore states that:

> i) Neither the Assuming Institution nor any of its Subsidiaries is in violation of any statue, regulation, order, decision, judgment or decree of, or any restriction imposed by, the United States of America, any State, municipality or other political subdivision or any agency of any of the foregoing, or any court or other tribunal having jurisdiction over the Assuming Institution or of any of its Subsidiaries, or the ownership of the properties of the Assuming Institution or any of its Subsidiaries, which, either individually or in the aggregate with all other such violations, would materially and adversely affect the business, operations or condition (financial or otherwise) of the Assuming Institution or the ability of the Assuming Institution to perform, satisfy or observe any obligation or condition under this Agreement.

> ii) Neither the execution and delivery nor the performance by the Assuming Institution of this Agreement will result in any violation by the Assuming Institution of, or be in conflict with, any provision of any applicable law or regulation or any order writ or decree of any court or governmental authority.

44.     Further, the Note which was executed on or about December 1, 2008— during which time the FDIC complaints that the fraudulent manipulation of the LIBOR rate occurred.

45.     According to the Notes, ¶ 2.1(a)(iv) states that:

> Lender will have no obligation to accept an election for a LIBOR Rate Portion if any of the following described events has occurred:

> (1) Dollar deposits in the principal amount, and for periods equal to the interest period, of a LIBOR Rate Portion are not available in the London inter-bank market; or
> (2) Maintenance of a LIBOR Rate Portion would violate any applicable law, rule, regulation or directive, whether or not having the force of law; or
> (3) The LIBOR Rate does not accurately reflect the cost of a LIBOR Rate Portion;

46. Based on the foregoing, BMO held a Note which charged a fraudulent interest rate in violation of the law and BMO's own loan provisions.

47. Upon information and belief, BMO ignored or recklessly disregarded the fact that the USD LIBOR had been an admitted manipulated and fraudulent rate and continued to index the Sklarovs' loans based on said fraudulent rate and took it a step further after defaulting the Sklarovs loan, indexing the default interest rate against the USD LIBOR with knowledge that it was a fraudulent rate.

48. Because an interest rate provision with the Note was in violation of the law, all payments made from the moment BMO had constructive or actual knowledge of the invalidity of the USD LIBOR should have been applied to the principal or a negotiated equitable adjustment, based on their own note. Unfortunately, this did not happen. At the very least, BMO should have moved off of the USD LIBOR and onto a more trustworthy rate such as the Prime, Treasury, or a fixed rate.

49. The Sklarovs consistently continued performing their part of the loan agreement for many years while the loan was being indexed against a known fraudulent interest rate.

50. The Sklarovs reasonably relied on the honesty of the affected benchmark rates in undertaking these transactions and holding LIBOR-based financial products.

51. They also agreed to settle the loan by reaching at an agreement with the Sklarovs.

52. However, BMO breached the loan agreement and the provisions of the promissory note.

53. Because the rate was based on a fraudulent calculation, all interest payments made based on the LIBOR should have been applied to Principal or equitably adjusted.

54. However, this was not the case with respect to the Sklarovs' loan. Despite BMO's actual or constructive knowledge of the fraudulent LIBOR rate, BMO continued to index the Sklarov's loan interest rate against a known fraudulent rate.

55. Consequently, BMO breached the contract because they violated the loan agreement, Note provisions, and applicable law.

56. As a direct and proximate result of the wrongful conduct as described in this Complaint, the Sklarovs have been injured in their business and property and have suffered damages in an amount presently undetermined.

## COUNT III: UNJUST ENRICHMENT

57. Plaintiffs reallege and hereby incorporate preceding paragraphs as if fully set forth herein.

58. The Seventh Circuit Court has held "[u]njust enrichment is a remedy that lies where a 'defendant has unjustly retained a benefit to the plaintiff's detriment and . . . the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'" Hess v. Kanoski & Associates, 668 F.3d 446, 455 (7th Cir. 2012) (quoting P. Properties, Inc. v. Rattner, 2011 IL App (2d) 110061(Ill. App. Ct. 2011)).

59. "The cause of action based on unjust enrichment, however, does not require fault or illegality on the part of the defendant; rather, the essence of the cause of

action is that one party is enriched and it would be unjust for that party to retain the enrichment." <u>Firemen's Annuity & Benefit Fund of City of Chicago v. Mun. Employees', Officers', & Officials' Annuity & Ben. Fund of Chicago</u>, 219 Ill. App. 3d 707, 712, 579 N.E.2d 1003, 1007 (Ill. App. Ct. 1st Dist. 1991) (internal citations omitted).

60.     Without any application to principal based on BMO Harris' own Note, BMO Harris has been unjustly enriched with interest payments that should have been equitably adjusted or applied to principal who would then have changed the complexion of whether or not this subject loan would have been in default.

## COUNT IV: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

61.     Plaintiffs reallege and hereby incorporate preceding paragraphs as if fully set forth herein.

62.     "Every contract implies good faith and fair dealing between the parties to it, and where an instrument is susceptible of two conflicting constructions, one which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted." <u>Martindell v. Lake Shore Nat'l Bank</u>, 15 Ill. 2d 272, 286 (Ill. 1958).

63.     "The duty of good faith and fair dealing is a limitation on the exercise of that discretion, requiring the party vested with discretion to exercise it reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the parties' reasonable expectations." <u>Gore v. Indiana Ins. Co.</u>, 376 Ill. App. 3d 282, 286, 876 N.E.2d 156, 162 (Ill. App. Ct. 2007).

64.     The subject Promissory Note—specifically, Sections 8.7 and 8.8—as stated above—indicate that the BMO Harris had provisions that all interest provisions contained within the note would comply with all applicable law, rules, and regulations.

-16-

Here, we have a USD LIBOR rate which has been admitted to have been a fraudulent and manipulated rate.[1]

65.     BMO Harris had never once notified or disclosed to the Sklarovs of this fraudulent and illegal conduct in the setting of the USD LIBOR rate, and in fact continued to index the subject loan to the USD LIBOR interest rate despite it being a fraudulent index rate.

66.     By virtue of these loan documents with the Sklarovs for the USD LIBOR-based financial products, BMO Harris owed a duty of good faith and fair dealing to the Sklarovs.

67.     As a result of the Sklarovs' reasonable reliance of these false representations of material fact, the Sklarovs' suffered damages in the form of, among other things, a larger spread between the USD LIBOR rate received by BMO Harris and what the actual rate could have been, changing.

68.     Contrary to their duty, BMO Harris knowingly continued to index the interest rate on the USD LIBOR and failed to disclose to the Sklarovs' or restrain from charging a manipulated and fraudulent rate.

69.     The Sklarovs reasonably relied on the BMO Harris' misrepresentations and nondisclosure and continued making interest payments pegged against the manipulated and fraudulent USD LIBOR rate and incurred damages.

## COUNT V: FRAUD

70.     Plaintiffs reallege and hereby incorporate preceding paragraphs as if fully set forth herein.

---

[1] http://www.washingtonpost.com/business/economy/geithner-drawn-into-libor-scandal/2012/07/12/gJQArDhbgW_story.html ("...Barclay's, one of Europe's largest banks, admitted that it schemed to manipulate Libor during the financial crisis...")

71.     Beginning in August 2007 (when financial news services began reporting on the manipulation of the USD LIBOR) and continuing through at least mid-2011, the following the USD LIBOR submissions were falsely represented on a daily basis:

72.     In mid-2008, the USD LIBOR scandal erupted regarding LIBOR rate setting.  Even after this scandal erupted, BMO Harris continued to index the Sklarovs' interest rate against USD LIBOR, with interest continuing to accrue and based on USD LIBOR.

73.     BMO Harris with the constructive and/or actual knowledge that there was a fraudulent LIBOR rate setting, never disclosed nor notified the Sklarovs of potential improprieties of the USD LIBOR and continued to index against the USD LIBOR rather than turning to other more accurate benchmarks to incorporate into their financial contracts.

74.     The subject Note clearly states that if an interest provision is "deemed to be invalid by reason of the operation of law, or by reason of the interpretation placed thereon by any administrative agency or any court, Borrower and Lender shall negotiate an equitable adjustment in the provisions."[2]

75.     However, BMO Harris never restrained itself from charging the Sklarovs' interest rate against the USD LIBOR, with interest continuing to accrue and based on the USD LIBOR, which action violates law.

76.     Numerous Panel Bank members have been fined and indictments handed down, and according to one settlement, "Barclays tried to manipulate Euribor and LIBOR for profit, while managers instructed rate-setters to make artificially low submissions to

---

[2] Fourth Amended Promissory Note, Section 8.7

avoid the perception the lender was under stress amid turmoil in credit markets in 2007 and 2008, according to the settlement."[3]

77.     As part of the U.S. and U.K. settlements, Barclays admitted rigging rates as early as 2005. Chief Executive Officer Robert Diamond and Chief Operating Officer Jerry Del Missier resigned over the scandal.[4]

78.     In the fall of 2009, the US Commodity Futures Trading Commission received a trove of information from Barclays's providing a broad view into the wrongdoing, "A series of incriminating e-mails and instant messages, regulators say, laid bare the multiyear scheme. In one document, a Barclay's employee said the bank was "being dishonest by definition."[5]

79.     The Department of Justice has brought federal criminal indictments against three individuals from the U.K. based brokerage ICAP and two other individuals for allegedly conspiring to rig interest rates, and these form only a small part of what is to be much larger scheme to manipulate and rig the USD LIBOR. "The five men indicted in the U.S. so far represent just a small fraction of the finance professionals who have been implicated in the Libor scandal so far."[6]

80.     According to the Justice Department's Acting Assistant Attorney General Mythili Raman, "…the investigation into LIBOR-rigging remains ongoing. It's one of the largest financial fraud investigations the department has ever done."[7]

---

[3] http://www.bloomberg.com/news/2012-07-26/libor-criminal-probe-in-u-k-starts-as-u-s-readies-indictments.html
[4] Id.
[5] http://dealbook.nytimes.com/2012/07/14/u-s-is-building-criminal-cases-in-rate-fixing/?_php=true&_type=blogs&_php=true&_type=blogs&_r=1
[6] http://money.cnn.com/2013/09/25/news/companies/icap-libor/
[7] Id.

81.     There has been billions of dollars assessed as fines in this USD LIBOR scandal, including $612 million against the Royal Bank of Scotland (RBS) and, "As part of its deferred prosecution agreement, the bank was forced to admit and accept responsibility for its misconduct."[8]

82.     Swiss Bank UBS has agreed to pay $1.5 billion after admitting to manipulating USD LIBOR, and the Chief Executive Officer even went as far as saying, "We deeply regret this inappropriate and unethical behavior."[9]

83.     BMO Harris, with the knowledge that there was admitted rate-setting and rigging, never disclosed nor notified the Sklarovs of the potential improprieties of the USD LIBOR and continued to index against the USD LIBOR rather than turning to other, more accurate benchmarks to incorporate into their financial contracts.

84.     BMO Harris had more than ample notice to know that the USD LIBOR was a fraudulent rate. However, BMO continued to set interest rates for the Sklarovs' loan based on the USD LIBOR. It would be disingenuous and dishonest to claim that BMO had no knowledge of the USD LIBOR manipulation.

85.     The subject Note clearly states that if an interest provision "....deemed to be invalid by reason of the operation of law, or by reason of the interpretation placed thereon by any administrative agency or any court, Borrower and Lender shall negotiate an equitable adjustment in the provisions."[10]

86.     As a direct and proximate result of BMO Harris' unlawful actions, omissions, and breaches, the Sklarovs suffered actual and consequential damages.

---

[8] http://www.reuters.com/article/2013/02/06/us-rbs-libor-idUSBRE91500B20130206
[9] http://money.cnn.com/2012/12/19/news/companies/ubs-libor-us-fine/index.html
[10] Fourth Amended Promissory Note Section 8.7

## COUNT VI: FRAUDULENT MISREPRESENTATION

87.     Plaintiffs reallege and hereby incorporate preceding paragraphs as if fully set forth herein.

88.     As explained above, BMO Harris had constructive or actual knowledge of the fraudulent acts of the Panel Banks in the USD LIBOR rate setting and manipulation, beginning on or about 2008 when all financial news services began reporting as to the USD LIBOR rate manipulation.

89.     Despite BMO Harris' knowledge of the fraudulent manipulation of the USD LIBOR rate they continued perpetuating the fraud by continuing to index the Sklarovs' subject interest rate against the USD LIBOR subsequent to constructive and/or actual knowledge of the fraudulent rate, and failed to disclose any potential issues with the USD LIBOR to the Sklarovs.

90.     BMO Harris continued indexing against a fraudulent rate despite their own provisions in the subject Note, which required a negotiated equitable adjustment; and such negotiation was ever proposed or has taken place between the Borrower and the Lender.

91.     BMO Harris had constructive notice as early as 2008 (when financial news services began reporting on the USD LIBOR scandal) that there were issues with the USD LIBOR, specifically that it was a fraudulent rate, knowingly perpetuated the fraud by continuing to index the subject interest rate with the USD LIBOR rather than disclose that it was set by collusions, and not competitive market forces.

92.     BMO Harris should have turned to other more accurate benchmarks to incorporate into their financial contracts, specifically the subject Note held by the

Sklarovs, rather than continue to index the Sklarovs' interest rate against a fraudulent

USD LIBOR.

93.     Based on the foregoing, BMO Harris had knowledge of the fraudulent

rates under the USD LIBOR, or was reckless to the truth or falsity of the language drafted

into the financial contracts executed with the Plaintiff.

94.     Further, the circumvention or concealment by BMO Harris of the alleged

fraudulent interest rates was the direct and proximate cause of damages to the Plaintiff's

business concerns.

## COUNT VII: NEGLIGENT MISREPRESENTATION

95.     Plaintiffs reallege and hereby incorporate preceding paragraphs as if fully

set forth herein.

96.     As mentioned in the preceding paragraphs, upon information and belief,

BMO Harris had constructive or actual knowledge of the fraudulent acts of the Panel

Banks and their role in the USD LIBOR rate setting and manipulation. They knew of the

manipulation as early as 2008, when all financial news services began reporting as to the

USD LIBOR rate manipulation.

97.     Sklarovs were harmed because BMO negligently misrepresented an

important fact that LIBOR was being fraudulently manipulated.

98.     That BMO represented and continued to index the interest rate against the

unlawfully manipulated interest rate, and knew that this interest rate was not a reflection

of the accurate interest rate.

99.     That Sklarovs relied on an accurate interest rate to be indexed against their loan, and were subsequently harmed by having a free market driven interest rate, but rather an artificially manipulated interest rate.

100.    BMO recklessly and negligently disregarded the issues with the USD LIBOR although they had actual and constructive notice as early as 2008 that the rate was fraudulent.

101.    BMO knowingly perpetuated the fraud by continuing to index the subject interest rate with the USD LIBOR rather than disclose that it was set by collusions, and not competitive market forces.

102.    As discussed above, BMO entered into contracts with the Sklarovs for LIBOR-based financial products. Per these contractual relationships, BMO had a special relationship with the Sklarovs and owed a duty of good faith and fair dealing to the Sklarovs.

103.    As a result of this special relationship, BMO had a duty to impart correct information to the Sklarovs.

104.    BMO breached this duty by continuing to index the Sklarovs' loan against fraudulent USD LIBOR and not disclosing to the Sklarovs the manipulated USD LIBOR. BMO also violated the Note provisions.

105.    BMO Harris should have turned to other more accurate benchmarks to incorporate into their financial contracts, specifically the subject Note held by the Sklarovs, rather than continue to index the Sklarovs' interest rate against a fraudulent USD LIBOR.

106.     Based on the foregoing, although BMO had knowledge of the fraudulent rates under the USD LIBOR, they were reckless to the truth or falsity of the language drafted into the financial contracts executed with the Sklarovs.

107.     As a result of this negligent misrepresentation and concealment of the alleged fraudulent interest rates, the Sklarovs suffered to the Plaintiffs' business concerns.

## COUNT VIII: VIOLATION OF ILLINOIS
## CONSUMER FRAUD-DECEPTIVE BUSINESS PRACTICES ACT

108.     Plaintiffs reallege and hereby incorporate preceding paragraphs as if fully set forth herein.

109.     Section 11(a) of the Consumer Fraud and Deceptive Business Practices Act (CFDBPA) "provides a clear mandate to the Illinois courts to utilize the [CFDBPA] to the greatest extent possible to eliminate all forms of deceptive or unfair business practices and provide appropriate relief for consumers." Totz v. Continental Du Page Acura, 236 Ill. App. 3d 891, 901, 602 N.E.2d 1374, 1380 (Ill. App. Ct. 2d Dist. 1992).

110.     Pursuant to 815 ILCS 505/1§1(c), the term "person" includes any natural person or his legal representative, partnership, corporation (domestic and foreign), company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof.

111.     A deceptive trade or business practice occurred in this action when Defendant failed to disclose the alleged fraud in the USD LIBOR rates and Plaintiff relied on the fraudulent information to his financial detriment.

112.    Defendant intended for Plaintiffs to rely on the false information as stated in the financial documents executed by the parties wherein the interest rates were based on the USD LIBOR and were fraudulently manipulated.

113.    The occurrence of the deception by BMO Harris was in the course of conduct involving trade and commerce.

114.    Defendant violated the ICFA provisions by using and continuing to use the USD LIBOR to index the Sklarovs' loans with the actual or constructive knowledge that the USD LIBOR rates were manipulated.

115.    The Sklarovs have suffered actual damages as a result of the deception.

116.    That the damages suffered by Plaintiffs were directly and proximately caused by Defendant's deceptive practices.

117.    BMO's deceptive, misleading, unfair or unconscionable practices set forth above were done willfully, wantonly, and maliciously entitling Plaintiff to a damage award.

## COUNT IX: UNCLEAN HANDS

118.    Plaintiffs hereby incorporate preceding paragraphs as if fully set forth herein.

119.    "The unclean hands doctrine provides that a party to a lawsuit may not obtain the relief it seeks if it has engaged in wrongful conduct." Smith v. United States, 293 F.3d 984, 988 (7th Cir. Ill. 2002). "The doctrine of unclean hands applies if a party seeking equitable relief is guilty of misconduct, fraud, or bad faith towards the party against whom relief is sought and if that misconduct is connected with the transaction at issue in the litigation." Zahl v. Krupa, 365 Ill. App. 3d 653, 658 (Ill. App. Ct. 2006).

120.     Here, BMO has filed a Complaint to Foreclose where borrowers have paid hundreds of thousands of dollars in interest payments based on an unlawfully manipulated rate.

121.     The subject Note has an explicit provision stating that any interest provision that is invalidated by operation of law will be equitably adjusted, or an application to principal thereof, none of which occurred here.

122.     Subsequent to the Panel Banks' admission that they fraudulently manipulated the interest rates, BMO continued to perpetuate the fraud by continuing to index the subject loan and even further indexing the default interest against the admittedly fraudulent rate.

123.     The vast majority of the payments applied to the mortgage and Notes since their origination in 2004 have been applied to interest payments only, amounting to hundreds of thousands of dollars.

124.     These interest payments were based on the manipulated interest rates that were contrary to the specific provisions contained within the Notes.  Had provisions 8.7 and 8.8 of the subject Note been exercised the loan might be current, therefore it is the misconduct on the behalf of BMO that directly contributed to the subject matter of this litigation.

## COUNT X: RESCISSION

125.     Plaintiffs reallege and hereby incorporate preceding paragraphs as if fully set forth herein.

126.     The Sklarovs are entitled to rescind the loan and all accompanying loan documents based on the aforementioned fraudulent acts of BMO.

127. According to the Note interest on the subject property/mortgage was required to accrue on the outstanding principal balance of the note at an annual rate equal to the LIBOR rate plus Four percent (4%).

128. The Sklarovs believed in good faith that the interest rate projected by BMO was fair and per competitive market forces.

129. As mentioned above, BMO, being in the banking sector, had actual or constructive knowledge of the fraudulent USD LIBOR rates and purposefully set the Sklarovs' loan rates based on the fraudulent USD LIBOR rates.

130. The Sklarovs' interest payments should have been applied to the principal or a negotiated equitable adjustment should have been reached with the Sklarovs starting from the time BMO had constructive or actual knowledge of invalidity of the USD LIBOR.

131. Notably, the subject Note has an explicit provision, which states that any interest provision that is invalidated by operation of law will be equitably adjusted, or an application to principal thereof. None of these options were used in this case.

132. At the very least, BMO should have moved off of the USD LIBOR and adopted a more trustworthy rate such as the Prime, Treasury, or a fixed rate.

133. BMO knowingly perpetuated the fraud by continuing to index the subject interest rate with the USD LIBOR rather than disclose to the Sklarovs that it was set by collusions, and not competitive market forces.

134. "[S]ubstantial nonperformance or breach of contract warrants rescission where the matter, in respect to which the failure of performance occurs, is of such a

nature and of such importance that the contract would not have been made without it." Ahern v. Knecht, 202 Ill.App.3d 709, 715, 150 Ill.Dec. 660, 563 N.E.2d 787.

135.    BMO breached the contract by continuing to use the fraudulent USD LIBOR as a benchmark to set the subject interest rate.

136.    Upon information and belief, BMO recklessly disregarded or ignored the Note provisions, specially the Fourth Amended Note provisions that were executed around December, 2008 – during which time the USD LIBOR manipulation began to unfold. The Sklarovs would not have agreed to the loan provisions and the subject interest rates if they knew that the rates that were being based on a fraudulent USD LIBOR.

137.    BMO's fraudulent conduct and nonperformance or breach of the contract provisions has caused Plaintiff to incur costs and expenses.

138.    Based on BMO's fraud, the loan agreements by and between BMO Harris Bank N.A. as successor in interest to Amcore Bank N.A. and the Sklarovs for the York Industrial property must be rescinded.

139.    BMO's conduct was fraudulent with complete disregard for the Sklarovs' legal and property rights.

140.    Plaintiffs are entitled to damages according to proof at trial.

## COUNT XI: TORTIOUS INTERFERENCE
## WITH PROSPECTIVE ECONOMIC ADVANTAGE

141.    Plaintiffs reallege and incorporate the preceding paragraphs as if set forth fully herein.

142. Upon information and belief, as more fully stated in the preceding paragraphs, BMO had actual or constructive knowledge or should have known that the USD LIBOR was manipulated.

143. BMO continued to perpetuate the fraud by continuing to index the subject loan and even further indexing the default interest against the admittedly fraudulent rate.

144. BMO never disclosed to the Sklarovs the truth about the manipulated USD LIBOR.

145. BMO anticipated that the Sklarovs would have opted for a different lender bank if they knew that the BMO was calculating the Sklarovs' loan interest rates based on a manipulated rate.

146. BMO did not reveal what it knew (manipulated USD LIBOR) and intentionally interfered with the Sklarovs' prospects of finding a better deal by means of fraudulent, wrongful methods, as described throughout this Complaint, and forced the Sklarovs to make interest payments based on a fraudulent index.

147. As a result of BMO's intentional interference with the Sklarovs' business expectancies, the Sklarovs suffered damages.

## COUNT XII: AIDING & ABETTING TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

148. Plaintiffs reallege and incorporate the preceding paragraphs as if set forth fully herein.

149. As mentioned above, the Panel Banks and BMO tortiously interfered with the Sklarovs' business expectancies.

150.    BMO had actual or constructive knowledge of the USD LIBOR manipulation by the Panel Bank.

151.    BMO aided and abetted the tortious interference committed by the Panel Banks by providing substantial assistance and participating in the tortious acts committed by the Panel Banks, by misrepresenting or not disclosing the fraudulent nature of the USD LIBOR. BMO's acts of aiding and abetting caused the Sklarovs to suffer substantial damages.

152.    Consequent to BMO's aiding and abetting, the Sklarovs suffered damages.

## COUNT XIII: AIDING & ABETTING TORTIOUS INTERFERENCE WITH CONTRACT

153.    Plaintiffs reallege and incorporate the preceding paragraphs as if set forth fully herein.

154.    The Panel Banks were aware that there were contracts that were entered between different entities which used the USD LIBOR as a base rate in various financial products, including the Sklarovs' contract.

155.    The Panel Banks purposefully manipulated the USD LIBOR and interfered with these contracts, including the Sklarovs' contract.

156.    BMO knew that the USD LIBOR was incorporated into many loan agreements nationwide, including the Sklarovs' loan agreements.

157.    As mentioned above, BMO aided and abetted the Panel Banks' tortious interference with contract by continuing to use the USD LIBOR as a benchmarking rate.

158.    As a result of BMO's aiding and abetting, the Sklarovs suffered damages.

## COUNT XIV: VIOLATION OF ILLINOIS FAIRNESS IN LENDING ACT

159.    Plaintiffs reallege and incorporate the preceding paragraphs as if set forth fully herein.

160.    BMO violated 815 ILCS 120/3 (c) by utilizing lending standards that have no economic basis.

161.    BMO used the manipulated USD LIIBOR to index the Slarovs' loan and as mentioned above, disregarded the note provisions in toto.

162.    BMO thus resorted to a lending standard that had no economic basis and violated Illinois Fairness in Lending Act.

163.    As a result of BMO's acts, Plaintiffs suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, VLADMIR A/K/A VAL SKLAROV and SHARON SKLAROV, individually and pursuant to power of direction for ATG TRUST COMPANY, as succesor trustee to NORTHERN TRUST COMPANY as trustee under trust agreement dated February 15, 2001 and known as trust number 9810 (collectively "Sklarovs") hereby request:

1. Enter a judgment that all interest payments made based on the LIBOR should be applied to Principal;

2. Enter an Order finding that BMO breached its obligations under the agreement and award damages to the Sklarovs as the trier of fact may deem just and proper in an amount in excess of the balance of the loan and other damages that may yet be ascertained;

3. Enter an Order awarding punitive damages to the extent that BMO's actions were fraudulent, malicious, reckless, or willful.

4. Any other relief the Court deems just and proper under the circumstances.

One of the Attorneys for Plaintiffs,

By: /s/ Patrick G. Somers_____

Patrick G. Somers,
Peoples Advocate Group, P.C.
336 Lathrop, Suite 101
Forest Park, IL 60130
Office: 847-257-7593
Fax: 847-257-7596

## FOURTH AMENDED
## AND RESTATED
## PROMISSORY NOTE

$940,899.13

Dated as of November 24, 2008
Chicago, Illinois

1.    __Agreement to Pay__. FOR VALUE RECEIVED, Val Sklarov and Sharon Sklarov (individually, "Individual Borrower" and jointly, "Individual Borrowers"), ATG Trust Company, as successor Trustee to Northern Trust Company, as Trustee ("Trustee") under Trust Agreement dated February 15, 2001 and known as Trust Number 9810 (the "Trust"), and Chicago Title Land Trust Company, as Trustee ("Trustee") under Trust Agreement dated January 20, 2000 and known as Trust Number 1108013 (the "Chicago Trust") (hereinafter the Individual Borrowers, the Trust, and the Chicago Trust are collectively referred to as the "Borrower") jointly and severally promise to pay to the order of AMCORE BANK, N.A., a national banking association, its successors and assigns ("Lender"), the principal sum of NINE HUNDRED FORTY THOUSAND EIGHT HUNDRED NINETY NINE AND 13/100 DOLLARS ($940,899.13) ("Loan"), pursuant to that certain Loan Agreement dated as of September 5, 2003 between the Individual Borrowers, the Trust and Lender ("Initial Loan Agreement") at the place and in the manner hereinafter provided, together with interest thereon at the rate or rates described below, and any and all other amounts which may be due and payable hereunder from time to time:

The original maturity date of the Loan was September 5, 2006 and Lender has extended the maturity date of the Loan from time to time as follows:

(A)    Lender initially extended the maturity date of the Loan of the Loan from September 5, 2006 to December 5, 2006 pursuant to that First Amended and Restated Mortgage Note dated as of September 5, 2006 ("First Modification").

(B)    Lender further extended the maturity date of the Loan from December 5, 2006 to March 5, 2007 pursuant to that Second Amended and Restated Mortgage Note dated as of December 5, 2006 ("Second Modification").

(C)    Lender further extended the maturity date of the Loan from March 5, 2007 to July 3, 2007 pursuant to letter agreement dated as of June 7, 2007 ("Third Modification").

(D)    Lender further extended the maturity date of the Loan from July 3, 2007 to November 30, 2007 pursuant to letter agreement dated as of October 15, 2007, 2007 ("Third Modification").

(E)    Lender further extended the maturity date of the Loan from November 30, 2007 to February 28, 2008 pursuant to letter agreement dated as of December 18, 2007 ("Fifth Modification").

(F)    Lender further extended the maturity date of the Loan from February 28, 2008 to


Exhibit "A"

May 28, 2008 pursuant to letter agreement dated as of February 28, 2008 ("Sixth Modification").

(G)    Lender further extended the maturity date of the Loan from May 28, 2008 to August 26, 2008 pursuant to letter agreement dated as of May 28, 2008 ("Seventh Modification").

(H)    Lender further extended the maturity date of the Loan from August 26, 2008 to November 24, 2008 pursuant to that Third Amended and Restated Mortgage Note dated as of August 26, 2008 ("Eighth Modification")

(I)    Lender hereby further extends the maturity date of the Loan from November 24, 2008 to May 24, 2009 in accordance with the terms and conditions of the Ninth Modification of Loan Documents dated of even date herewith by and between Borrower and Lender ("Ninth Modification") (hereinafter the First Modification, the Second Modification, the Third Modification, the Fourth Modification, the Fifth Modification, the Sixth Modification, the Seventh Modification, the Eighth Modification and the Ninth Modification are collectively referred to in this Note as the "Modifications" and the Initial Loan Agreement and the Modifications are collectively referred to in this Note at the "Loan Agreement").

This Fourth Amended and Restated Promissory Note ("Note") is issued in exchange and replacement for, and evidences the same indebtedness incurred to the date hereof under that certain Third Amended and Restated Promissory Note dated as of August 26, 2008 from Borrower to Lender in the original principal amount of NINE HUNDRED FIFTY ONE THOUSAND NINE HUNDRED THIRTY ONE AND 86/100 DOLLARS ($951,931.86) (the "Prior Note"). The indebtedness evidenced by the Prior Note and the Modification is continuing indebtedness, and nothing in this Note shall be deemed to constitute a payment, settlement, or novation of the Prior Note, or the release of, or otherwise adversely affect, any lien, mortgage, or security interest securing such indebtedness or any rights of Lender against the undersigned, or any Guarantor of the Prior Note or this Note. All of the obligations of Borrower shall, from and after execution and delivery of this Note by Borrower, continue in full force and effect as set forth herein. Any interest accrued on such Prior Note as of the date hereof will be included in the next monthly payment due hereunder, and any interest adjustment payments or credits accrued on such Prior Note as of the date hereof will be included in calculation of the next interest adjustment payment or credit due hereunder.

2.    <u>Interest Rate.</u>

2.1    Interest Prior to Default.

(a)    Interest shall accrue on the outstanding principal balance of this Note from the date hereof through May 24, 2009 ("Maturity Date") at a floating annual rate equal to the LIBOR Rate (as hereinafter defined), based upon a thirty (30) day contract, plus four percent (4.00%) ("Interest Rate").

2

(i)     "LIBOR Rate" means the interest rate determined by the following formula, rounded upward to the nearest 1/100 of one percent (all amounts in the calculation will be determined by Lender as of the first day of the interest period:

$$LIBOR = \frac{\text{London Inter-Bank Offered Rate}}{(1.00 - \text{Reserve Percentage})}$$

Where,

(1)     "London Inter-Bank Offered Rate" means the rate per annum equal to the offered rate for deposits in U.S. dollars for the applicable interest period and for amounts comparable to the LIBOR Rate Portion published by Bloomberg's Financial Markets Commodities News at approximately 8:00 a.m. Chicago time two (2) Business Days before the commencement of the interest period (or if not so published, Lender, in its sole discretion, shall designate another daily financial or governmental publication of national circulation to determine such rate); provided, however, that after the first election of an interest period with respect to any Portion, the London Inter-Bank Offered Rate shall be determined at approximately 8:00 a.m. Chicago time on the first Business Day of the month for each interest period thereafter with respect to such Portion.

(2)     "Reserve Percentage" means the total of the maximum reserve percentages for determining the reserves to be maintained by member banks of the Federal Reserve System for Eurocurrency Liabilities, as defined in Federal Reserve Board Regulation D, rounded upward to the nearest 1/100 of one percent. The percentage will be expressed as a decimal, and will include, but not be limited to, marginal, emergency, supplemental, special, and other reserve percentages.

(ii)     Each prepayment of a LIBOR Rate Portion, whether voluntary, involuntary, by reason of acceleration or otherwise, will be accompanied by the amount of accrued interest on the amount prepaid and the "Make Whole Costs", as described below. A "prepayment" is a payment of an amount on a date earlier than the scheduled payment date for such amount as required by this Note. The "Make Whole Costs" shall be equal to all costs, expenses, penalties and charges incurred by Lender as a result of the early termination or breakage of a LIBOR Rate Portion plus any Additional Costs (hereinafter defined) and the amount (if any) by which:

3

(1) the additional interest which would have been payable during the interest period on the amount prepaid had it not been prepaid, exceeds

(2) the interest which would have been recoverable by Lender by placing the amount prepaid on deposit in the domestic certificate of deposit market, the eurodollar deposit market, or other appropriate money market selected by Lender, for a period starting on the date on which it was prepaid and ending on the last day of the interest period for such Portion (or the scheduled payment date for the amount prepaid, if earlier).

(iii) Each prepayment of a LIBOR Rate Portion, whether voluntary, involuntary, by reason of acceleration or otherwise, will be accompanied by the amount of accrued interest on the amount prepaid and any and all costs, expenses, penalties and charges incurred by Lender as a result of the early termination or breakage of a LIBOR Rate Portion.

(iv) Lender will have no obligation to accept an election for a LIBOR Rate Portion if any of the following described events has occurred and is continuing:

(1) Dollar deposits in the principal amount, and for periods equal to the interest period, of a LIBOR Rate Portion are not available in the London inter-bank market; or

(2) maintenance of a LIBOR Rate Portion would violate any applicable law, rule, regulation or directive, whether or not having the force of law; or

(3) the LIBOR Rate does not accurately reflect the cost of a LIBOR Rate Portion; or

(4) an Event of Default has occurred and is continuing or any event or circumstance exists which, with the giving of notice or passage of time, would constitute an Event of Default.

(v) In addition, Borrower shall be responsible for paying any costs ("Additional Costs") actually incurred by Lender as a direct result of any change in Lender's cost of complying with any law, rule, regulation or other requirement imposed, interpreted or enforced by any federal, state or other governmental or monetary authority which is applicable to assets held by or deposits or accounts with or credits extended by Lender and which causes Lender to incur costs or increases the effective cost to Lender of lending to Borrower at the LIBOR Rate or decreases the effective spread or yield of four percent (4.0%) per annum above the LIBOR Rate which would be made by Lender on a LIBOR Rate Portion.

4

2.2 **Interest After Default.** From and after the Maturity Date or upon the occurrence and during the continuance of an Event of Default, interest shall accrue on the balance of principal remaining unpaid during any such period at an annual rate ("Default Rate") equal to five percent (5%) plus the Interest Rate; provided, however, in no event shall the Default Rate exceed the maximum rate permitted by law. The interest accruing under this paragraph shall be immediately due and payable by Borrower to the holder of this Note upon demand and shall be additional indebtedness evidenced by this Note.

2.3 **Interest Calculation.** Interest on this Note shall be calculated on the basis of a 360-day year and the actual number of days elapsed in any portion of a month in which interest is due.

3. **Payment Terms.**

3.1 **Principal and Interest.** Payments of principal and interest due under this Note, if not sooner declared to be due in accordance with the provisions hereof, shall be made as follows:

(a) Commencing on December 10, 2008 and on the tenth (10th) of each month thereafter through and including the month in which the Maturity Date occurs, interest accrued on the portions of this Note bearing interest at the Interest Rate shall be due and payable. Interest on each LIBOR Rate portion shall be paid in arrears on the first Business Day of each month. Interest accrued on any LIBOR Rate Portion as of the date of termination, breakage or other disposition shall be due and payable in full on the date of such termination, breakage or disposition.

(b) Commencing on December 10, 2008 and on the tenth (10th) of each month thereafter through and including the month in which the Maturity Date occurs, payments of principal shall be due and payable in an amount required to fully amortize the outstanding principal balance of the Loan in equal, consecutive monthly installments over the remaining term of the twenty five (25) year amortization period that previously commenced as of November 10, 2003.

(c) The unpaid principal balance of this Note, if not sooner paid or declared to be due in accordance with the terms hereof, together with all accrued and unpaid interest thereon and any other amounts due and payable hereunder or under any other Loan Document (as hereinafter defined), shall be due and payable in full on the Maturity Date.

3.2 **Application of Payments.** Prior to the occurrence of an Event of Default, all payments and prepayments on account of the indebtedness evidenced by this Note shall be applied as follows: (a) first, to fees, expenses, costs and other similar amounts then due and payable to Lender, including, without limitation any prepayment premium, exit fee or late charges due hereunder; (b) second, to accrued and unpaid interest on the principal balance of this Note, (c) third, to the payment of principal due in the month in which the payment or prepayment is made, (d) fourth, to any escrows, impounds or other

amounts which may then be due and payable under the Loan Documents (as hereinafter defined), (e) fifth, to any other amounts then due Lender hereunder or under any of the Loan Documents, and (f) last, to the unpaid principal balance of this Note in the inverse order of maturity. Any prepayment on account of the indebtedness evidenced by this Note shall not extend or postpone the due date or reduce the amount of any subsequent monthly payment of principal and interest due hereunder. After an Event of Default has occurred and is continuing, payments may be applied by Lender to amounts owed hereunder and under the Loan Documents in such order as Lender shall determine, in its sole discretion.

3.3    **Method of Payments.** All payments of principal and interest hereunder shall be paid by automatic debit, wire transfer, check or in coin or currency which, at the time or times of payment, is the legal tender for public and private debts in the United States of America and shall be made at such place as Lender or the legal holder or holders of this Note may from time to time appoint in the payment invoice or otherwise in writing, and in the absence of such appointment, then at the offices of Lender at:

1180 East Higgins Road<br>
Second Floor<br>
Schaumburg, Illinois 60173

Payment made by check shall be deemed paid on the date Lender receives such check; provided, however, that if such check is subsequently returned to Lender unpaid due to insufficient funds or otherwise, the payment shall not be deemed to have been made and shall continue to bear interest until collected. Notwithstanding the foregoing, the final payment due under this Note must be made by wire transfer or other final funds. Interest, principal payments and any fees and expenses owed Lender from time to time will be deducted by Lender automatically on the due date from Borrower's account with Lender, as designated in writing by Borrower. Borrower will maintain sufficient funds in the account on the dates Lender enters debits authorized by this Note. If there are insufficient funds in the account on the date Lender enters any debit authorized by this Note, the debit will be reversed. Borrower may terminate this direct debt arrangement at any time by sending written notice to Lender at the address specified above.

3.4    **Late Charge.** If any payment of interest or principal due hereunder is not made within five (5) days after such payment is due in accordance with the terms hereof, then, in addition to the payment of the amount so due, Borrower shall pay to Lender a "late charge" of five cents for each whole dollar so overdue to defray part of the cost of collection and handling such late payment. Borrower agrees that the damages to be sustained by the holder hereof for the detriment caused by any late payment are extremely difficult and impractical to ascertain, and that the amount of five cents for each one dollar due is a reasonable estimate of such damages, does not constitute interest, and is not a penalty.

3.5    **Loan Fees.** In consideration of Lender's agreement to make the Loan, Borrower shall pay to Lender a Loan Operation Servicing fee in the amount of One

Thousand Five Hundred and no/100 Dollars ($1,500.00), which shall be due and payable in full as a condition precedent to disbursement of proceeds under this Note.

4. __Security__. This Note is secured by a Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing ("Mortgage") made by Borrower to Lender dated September 5, 2003 and recorded on September 11, 2003 in the Office of the Recorder of Deeds ("Recorder's Office"), Cook County, Illinois as Document No. 0325442362 which Mortgaged created a first mortgage lien on certain real property ("Premises") legally described in Exhibit A attached to the Mortgage, an Assignment of Rents and Leases ("Assignment") from Borrower to Lender dated September 5, 2003 and recorded on September 11, 2003 as Document No. 0325442363, and an Environmental Indemnity Agreement ("Indemnity Agreement") dated September 5, 2003 from Borrower to Lender (the Loan Agreement, the Mortgage, the Assignment, the Indemnity Agreement, the Modifications, and any other document now or hereafter given to evidence or secure payment of this Note or delivered to induce Lender to disburse the proceeds of the Loan, as such documents may hereafter be amended, restated or replaced from time to time, are hereinafter collectively referred to as the "Loan Documents"). Reference is hereby made to the Loan Documents (which are incorporated herein by reference as fully and with the same effect as if set forth herein at length) for a statement of the covenants and agreements contained therein, a statement of the rights, remedies, and security afforded thereby, and all matters therein contained.

This Note is further secured by the Eighth Modification of Loan Documents dated as of August 26, 2008 ("Eighth Modification") whereby Chicago Trust mortgaged, pledged, and conveyed to Lender a mortgage lien upon the real property commonly known as 514-554 York Boulevard, Bensenville, Illinois 60106 (the "Bensenville Property") as additional collateral for this Note.

5. __Events of Default__. The occurrence of any one or more of the following events shall constitute an "Event of Default" under this Note:

5.1 the failure by Borrower to pay (i) any installment of principal or interest payable pursuant to this Note when due, or (ii) any other amount payable to Lender under this Note, the Mortgage or any of the other Loan Documents within five (5) days after the date when any such payment is due in accordance with the terms hereof or thereof; or

5.2 the occurrence of any "Event of Default" under the Loan Agreement, the Mortgage or any of the other Loan Documents; or

6. __Remedies__. At the election of the holder hereof, and without notice, the principal balance remaining unpaid under this Note, and all unpaid interest accrued thereon and any other amounts due hereunder, shall be and become immediately due and payable in full upon the occurrence of any Event of Default. Failure to exercise this option shall not constitute a waiver of the right to exercise same in the event of any subsequent Event of Default. No holder hereof shall, by any act of omission or commission, be deemed to waive any of its rights, remedies or powers hereunder or otherwise unless such waiver is in writing and signed by the holder hereof, and then only to the extent specifically set forth therein. The rights, remedies and powers of the holder hereof, as provided in this Note, the Mortgage and in all of the other Loan Documents are

7

cumulative and concurrent, and may be pursued singly, successively or together against Borrower, the Premises and any other security given at any time to secure the repayment hereof, all at the sole discretion of the holder hereof. If any suit or action is instituted or attorneys are employed to collect this Note or any part hereof, Borrower promises and agrees to pay all costs of collection, including reasonable attorneys' fees and court costs.

7. **Covenants and Waivers**. Borrower and all others who now or may at any time become liable for all or any part of the obligations evidenced hereby, expressly agree hereby to be jointly and severally bound, and jointly and severally: (i) waive and renounce any and all homestead, redemption and exemption rights and the benefit of all valuation and appraisement privileges against the indebtedness evidenced by this Note or by any extension or renewal hereof; (ii) waive presentment and demand for payment, notices of nonpayment and of dishonor, protest of dishonor, and notice of protest; (iii) except as expressly provided in the Loan Documents, waive any and all notices in connection with the delivery and acceptance hereof and all other notices in connection with the performance, default, or enforcement of the payment hereof or hereunder; (iv) waive any and all lack of diligence and delays in the enforcement of the payment hereof; (v) agree that the liability of each Borrower, guarantor, endorser or obligor shall be unconditional and without regard to the liability of any other person or entity for the payment hereof, and shall not in any manner be affected by any indulgence or forbearance granted or consented to by Lender to any of them with respect hereto; (vi) consent to any and all extensions of time, renewals, waivers, or modifications that may be granted by Lender with respect to the payment or other provisions hereof, and to the release of any security at any time given for the payment hereof, or any part thereof, with or without substitution, and to the release of any person or entity liable for the payment hereof; and (vii) consent to the addition of any and all other makers, endorsers, guarantors, and other obligors for the payment hereof, and to the acceptance of any and all other security for the payment hereof, and agree that the addition of any such makers, endorsers, guarantors or other obligors, or security shall not affect the liability of Borrower, any guarantor and all others now liable for all or any part of the obligations evidenced hereby. This provision is a material inducement for Lender making the Loan to Borrower.

8. **Other General Agreements**.

8.1    The Loan is a business loan which comes within the purview of Section 205/4, paragraph (1) (c) of Chapter 815 of the Illinois Compiled Statutes, as amended. Borrower agrees that the Loan evidenced by this Note is an exempted transaction under the Truth In Lending Act, 15 U.S.C., Section 1601, et seq.

8.2    Time is of the essence hereof.

8.3    This Note is governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the statutes, laws and decisions of the State of Illinois. This Note may not be changed or amended orally but only by an instrument in writing signed by the party against whom enforcement of the change or amendment is sought.

8.4    Lender shall not be construed for any purpose to be a partner, joint venturer, agent or associate of Borrower or of any lessee, operator, concessionaire or

8

licensee of Borrower in the conduct of its business, and by the execution of this Note, Borrower agrees to indemnify, defend, and hold Lender harmless from and against any and all damages, costs, expenses and liability that may be incurred by Lender as a result of a claim that Lender is such partner, joint venturer, agent or associate.

8.5     This Note has been made and delivered at Chicago, Illinois and all funds disbursed to or for the benefit of Borrower will be disbursed in Chicago, Illinois.

8.6     If this Note is executed by more than one party, the obligations and liabilities of each Borrower under this Note shall be joint and several and shall be binding upon and enforceable against each Borrower and their respective successors and assigns. This Note shall inure to the benefit of and may be enforced by Lender and its successors and assigns.

8.7     If any provision of this Note is deemed to be invalid by reason of the operation of law, or by reason of the interpretation placed thereon by any administrative agency or any court, Borrower and Lender shall negotiate an equitable adjustment in the provisions of the same in order to effect, to the maximum extent permitted by law, the purpose of this and the validity and enforceability of the remaining provisions, or portions or applications thereof, shall not be affected thereby and shall remain in full force and effect.

8.8     If the interest provisions herein or in any of the Loan Documents shall result, at any time during the Loan, in an effective rate of interest which, for any month, exceeds the limit of usury or other laws applicable to the Loan, all sums in excess of those lawfully collectible as interest of the period in question shall, without further agreement or notice between or by any party hereto, be applied upon principal immediately upon receipt of such monies by Lender, with the same force and effect as though the payer has specifically designated such extra sums to be so applied to principal and Lender had agreed to accept such extra payment(s) as a premium-free prepayment. Notwithstanding the foregoing, however, Lender may at any time and from time to time elect by notice in writing to Borrower to reduce or limit the collection to such sums which, when added to the said first-stated interest, shall not result in any payments toward principal in accordance with the requirements of the preceding sentence. In no event shall any agreed to or actual exaction as consideration for this Loan transcend the limits imposed or provided by the law applicable to this transaction or the makers hereof in the jurisdiction in which the Premises are located for the use or detention of money or for forbearance in seeking its collection.

8.9     Lender may at any time assign its rights in this Note and the Loan Documents, or any part thereof and transfer its rights in any or all of the collateral, and Lender thereafter shall be relieved from all liability with respect to such collateral. In addition, Lender may at any time sell one or more participations in the Note. Borrower may not assign its interest in this Note, or any other agreement with Lender or any portion thereof, either voluntarily or by operation of law, without the prior written consent of Lender.

9

9. **Notices**. All notices required under this Note will be in writing and will be transmitted in the manner and to the addresses or facsimile numbers required by the Loan Agreement, or to such other addresses or facsimile numbers as Lender and Borrower may specify from time to time in writing. Provided, however, that notices to Lender shall be at the address specified in Section 3.3 of this Note.

10. **Consent to Jurisdiction**. TO INDUCE LENDER TO ACCEPT THIS NOTE, BORROWER IRREVOCABLY AGREES THAT, SUBJECT TO LENDER'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS NOTE WILL BE LITIGATED IN COURTS HAVING SITUS IN CHICAGO, ILLINOIS. BORROWER HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN CHICAGO, ILLINOIS, WAIVES PERSONAL SERVICE OF PROCESS UPON BORROWER, AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO BORROWER AT THE ADDRESS STATED IN THE MORTGAGE AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.

11. **Waiver of Jury Trial**. BORROWER AND LENDER (BY ACCEPTANCE OF THIS NOTE), HAVING BEEN REPRESENTED BY COUNSEL, EACH KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (a) UNDER THIS NOTE OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS NOTE OR (b) ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS NOTE, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. BORROWER AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST LENDER ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

12. **Trustee Exculpation**. This Note is executed by the Trustee, not personally but solely as Trustee as aforesaid, in the exercise of the power and authority conferred upon and vested in it as such Trustee, and it is expressly understood and agreed that nothing in this Note shall be construed as creating any liability on such Trustee personally to perform any express or implied covenant, condition or obligation under this Note. Notwithstanding the foregoing, the Lender shall not be precluded from: (a) recovering any condemnation awards or insurance proceeds attributable to the Project; (b) recovering any tenant security deposits, advance or pre-paid rents; or (c) enforcing the personal liability of the Individual Borrowers as co-makers of the Note, (d) enforcing the personal liability of the Individual Borrowers under the terms of this Note and the other Loan Documents, and (e) of the payment of the Note.

[SIGNATURE PAGE FOLLOWS]

10

**IN WITNESS WHEREOF**, each Borrower has executed and delivered this Fourth Amended and Restated Promissory Note as of the day and year first written above.

**BORROWER:**

**ATG Trust Company, as Successor Trustee** to Northern Trust Company, as Trustee under Trust Agreement dated February 15, 2001 and known as Trust Number 9810 and not personally or individually

By: _____
Name: PEGGY PETERS
Title: Vice President

Val Sklarov

Sharon Sklarov

**Chicago Title Land Trust Company** as Trustee under Trust Agreement dated January 20, 2000 and known as Trust Number 1108013

By: _____
Name: _____
Title: _____
        Elizabeth Cordova
        AVP & Land Trust Officer

# 6032853_v2

This instrument is executed by the undersigned Land Trustee, not personally but solely as Trustee in the exercise of the power and authority conferred upon and vested in it as such Trustee. It is expressly understood and agreed that all the warranties, indemnities, representations, covenants, undertakings and agreements herein made on the part of the Trustee are undertaken by it solely in its capacity as Trustee are not personally. No personal liability or personal responsibility is assumed by or shall at any time be asserted or enforceable against the Trustee on account of any warranty, indemnity, representation, covenant, undertaking or agreement of the Trustee in this instrument.

11

JUDGE WOODS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**



14 CV 1757

RECEIVED
MAR 14 2014
U.S.D.C. S.D.N.Y.

FEDERAL DEPOSIT INSURANCE )
CORPORATION AS RECEIVER FOR AMCORE )
BANK, N.A.; FEDERAL DEPOSIT INSURANCE )
CORPORATION AS RECEIVER FOR AMTRUST )
BANK; FEDERAL DEPOSIT INSURANCE )
CORPORATION AS RECEIVER FOR )
BANKUNITED, F.S.B.; FEDERAL DEPOSIT )
INSURANCE CORPORATION AS RECEIVER )
FOR CALIFORNIA NATIONAL BANK; )
FEDERAL DEPOSIT INSURANCE )
CORPORATION AS RECEIVER FOR COLONIAL )
BANK; FEDERAL DEPOSIT INSURANCE )
CORPORATION AS RECEIVER FOR )
COMMUNITY BANKS OF COLORADO; )
FEDERAL DEPOSIT INSURANCE )
CORPORATION AS RECEIVER FOR CORUS )
BANK, N.A.; FEDERAL DEPOSIT INSURANCE )
CORPORATION AS RECEIVER FOR DOWNEY )
SAVINGS AND LOAN ASSOCIATION, F.A.; )
FEDERAL DEPOSIT INSURANCE )
CORPORATION AS RECEIVER FOR )
EUROBANK; FEDERAL DEPOSIT INSURANCE )
CORPORATION AS RECEIVER FOR FIRST )      **COMPLAINT**
COMMUNITY BANK; FEDERAL DEPOSIT )
INSURANCE CORPORATION AS RECEIVER )
FOR FIRST FEDERAL BANK OF CALIFORNIA, )   **CASE NO.:**
F.S.B.; FEDERAL DEPOSIT INSURANCE )
CORPORATION AS RECEIVER FOR FIRST )
NATIONAL BANK; FEDERAL DEPOSIT )
INSURANCE CORPORATION AS RECEIVER )      **JURY TRIAL DEMANDED**
FOR FIRST REGIONAL BANK; FEDERAL )
DEPOSIT INSURANCE CORPORATION AS )
RECEIVER FOR FRONTIER BANK; FEDERAL )
DEPOSIT INSURANCE CORPORATION AS )
RECEIVER FOR GEORGIAN BANK; FEDERAL )
DEPOSIT INSURANCE CORPORATION AS )
RECEIVER FOR GUARANTY BANK; )

Exhibit "B"